## Barr *against* Myers.

If by a contract of sale of portable articles neither time nor place of performance be stipulated, the rule is, that the articles sold are to be delivered at the place where they are at the time of sale. But when the time of delivery is fixed by the contract, the vendor must seek the vendee at his residence, and there tender the articles; and in the case of cumbersome articles, when the delivery is to be to the vendee, the vendor must seek the vendee a reasonable time before the day of delivery, and ask him to appoint a place of delivery.

ERROR to the Common Pleas of *Cumberland* county.

This was an action of debt by J. J. Myers and Jacob Squier, endorsees of Thomas Underwood, against William Barr, James Hannan, William Woodburn, and Samuel Hinkley, in which the plaintiffs declared upon a negotiable note of the defendants to Thomas Underwood, for $250, endorsed to plaintiffs before its maturity, which was given in evidence.

The defendants alleged that the consideration of the note was a sale of 2000 morus multicaulis trees by the plaintiffs to the defendants, and that Thomas Underwood was the mere agent of the plaintiffs in making the sale and taking the note, and its consideration failed by reason of the plaintiffs not having delivered the trees according to their contract, which was given in evidence, as follows:

*Carlisle, September* 7, 1839.

On or before the 21st of November 1839, we promise to deliver to William Barr & Co., 2000 morus multicaulis mulberry trees, in good order, and free from damage of any kind, except such as may happen from hail, frost, or bad weather. It is understood that the said trees are to be cultivated and taken care of in a proper manner until the time of delivery. The above trees are those now growing on a lot in the occupancy of J. J. Myers and J. Squier, west of Carlisle, and the said trees are growing on the west end of said lot.

JOHN J. MYERS & J. SQUIER.
Per JOHN J. MYERS.

*Newville, September* 11, 1839.

I certify that the within multicaulis trees were sold by me for J. J. Myers and J. Squier, to be delivered to Barr, Woodburn, Hinkley, and Hannan; and that I received their notes for value for the said trees, which I have given over to said Myers and Squier, except the last note, which I hold; and that I have satisfied J. J. Myers and J. Squier for said trees with said notes.

THOMAS UNDERWOOD.

The defendants then called Thomas Underwood, who testified as follows:

The original agreement was executed on the 7th of September 1839, the time it bears date. I presume this is one of the notes given in part payment of that contract. (The note of 1st of November 1839, in suit.)

Cross-examined—I think it was some time in September, I came here on my own business. In conversation with Dr Myers and others, who had mulberry trees to sell here, I was induced, with a view of making something, to embark in the business. I did agree with the doctor to furnish me with trees at 30 cents apiece; all that I could make over that should be my profits, without any further writings that I know of. I went on to Newville, there offered trees for sale, and Mr Barr, Woodburn, or some one or more of them, seemed inclined to purchase, and there were three or four of them agreed together that if they could bargain for the trees they would buy them. In consequence they appointed W. M. Woodburn to come and see the trees. Accordingly him and I came to Carlisle for that purpose, and we saw the trees, and others that were growing, owned by other persons. On returning to Newville he appeared more satisfied, enough to encourage the others to go into the purchase. Accordingly they appointed Mr Barr to go the next day, and we came down the second day, Barr and myself, and examined those trees with others growing east of town. When we returned, he encouraged them to agree. They did agree. Mr Barr then drew up those notes—those that were to pay for the trees. They were to pay me 40 cents a tree, for which, after they had given me their notes, I gave them something similar to that agreement of Squier and Myers, signed by myself. I told them being as I was going away not to return, I could not deliver the trees myself, but would procure for them more responsible men than I was, and asked them if they would give up the paper I gave them, if I would procure one from Myers and Squier. They agreed they would. I then came to Carlisle with the notes I received, and gave them to Dr Myers, and asked him to give something of this kind for those men in Newville. Accordingly, after arranging the notes, he wrote this agreement (one of 7th of September 1839). When I returned to Newville with it to exchange for the one I had given them, Mr Hannan expressed some doubts as to whether they ought not to have something to show that I had actually satisfied Mr Squier and Dr Myers for those trees, and I think Mr Hannan wrote this matter on the back of this agreement, and I signed it. That finished the transaction. When we came down to see the trees, we did not call on Dr Myers or Jacob Squier. I was to pay Dr Myers and Mr Squier. Nobody else was to be responsible to them. I think I sold them the trees on my own account. The reasons for my thinking so, are that neither those men in Newville nor Dr Myers knew what

[Barr v. Myers.]

I was making on the trees.  Never made any return of sale to Dr Myers.  When I came to see the doctor, after the sale, I paid him with those notes.  I paid the doctor the first thing I done before I received anything from him.  I gave him the notes the same day, and at the interview.  I came to Dr Myers and paid him with the notes the first thing I did when I came to town from Newville.  Then I asked him to give me this article for those men.  This was after I settled with him for the trees.  I stated to him the same I did to those in Newville—that I would be away and could not attend to the delivery of the trees.

I don't know that any place was designated.  Before I engaged the trees, the Dr and I went over the ground.  Those I agreed to purchase were on the west end of the lot—those on the east side were the least trees.  I lived in Dillstown at the time of the purchase.

Certainly, I stated those trees were growing in Dr Myers's lot.  I took them there and showed them to them.

I of course told Dr Myers I had sold the trees when I gave him the notes.  More than likely I told Dr Myers what I got for the trees; but I can't remember.  I was not bound to take any trees from Dr Myers, unless I made sale of them.  I retained my profits out of the notes, amounting to $200.

There was money paid on the contract—$50 was paid—it was paid to me by those men who purchased the trees.  When I came to Carlisle to pay the Doctor for the trees, to make up his amount of $600, I gave him my own note for the $50.  It has not since been paid.

The plaintiffs then called several witnesses, who testified that the trees were carefully taken up about the middle of October, bound up in bundles of 100 each, and put away in the cellar of the plaintiffs, at Carlisle, where they remained, ready to be delivered to the defendants, when called for; until the following spring, when they were taken to the residence of the defendants, at Newville, and tendered to them; but they refused to receive them.

The defendants requested the court to charge the jury:

1. That by the agreement of the 7th of September 1839, the plaintiffs were bound to go to the defendants and transfer or offer to deliver the trees mentioned in the agreement; and if the jury believe that the trees were too ponderous or bulky, then the plaintiffs were bound to go to the defendants a reasonable time before the time stipulated for the delivery (21st November 1839), and ask them to appoint a time and place when and where they would receive them.

2. If the jury believe that the plaintiffs, when they received the note in suit, knew that the consideration of the same was a sale of multicaulis trees to the defendants, and at the same time gave an engagement in writing to deliver the trees on or before the 21st

III. — 38

[Barr v. Myers.]

of November then next, and they failed to deliver them according to their contract, they are not *bonâ fide* holders of the note, without notice, such as are privileged from the effect of an equitable defence by the payers of the note.

3. If the jury believe that the consideration of the note on which suit is brought, was 2000 multicaulis trees, to be delivered to the defendants on or before the 21st of November 1839, and the trees were not delivered or offered to be delivered to the defendants until the following April or May, the consideration failed, and the plaintiffs cannot recover.

The plaintiffs requested the court to charge the jury:

1. If this was a case of sale, the plaintiffs were not bound to deliver the trees at Newville, but the place of sale was the place of delivery. And if the trees were seasonably taken up by the plaintiffs, bound up in convenient bundles, prepared and ready for delivery before and on the 21st of November 1839, and the defendants made no demand and never sent for the trees, there is no such want of delivery on the part of the plaintiffs as to constitute a defence in this case.

The court below adopted the distinction taken by the plaintiffs, and instructed the jury that the plaintiffs were entitled to recover.

*Watts,* for plaintiffs in error, argued that no such distinction can be found, in any book of good authority, as that between a contract of *sale* of portable articles and an engagement to pay a debt at another time in such articles, in reference to the place and manner of delivery. Whether it be a contract of sale or to pay a debt, it must be interpreted *ex visceribus suis*. Where the articles are to be delivered, may be as well indicated as expressed; and there can be no stronger expression of the intention of the parties that they are to be delivered to the vendee, than fixing a *time* for their delivery. The vendor thereby becomes the first actor; he has bound himself to deliver by a fixed time; and he must therefore tender the articles to the vendee, at his residence; and if they be cumbersome, he must ask the vendee to designate a convenient place: and such is the rule laid down in all the authorities. 2 *Kent's Com.* 398, 399; 2 *New-Hamp.* 75; 5 *Greenleaf* 195; 2 *Penn. Rep.* 63.

*Biddle* and *Reed, contra,* argued that the distinction between a contract of sale, and payment of a debt, was well taken; and cited 2 *Kent's Com.* 492, 505, 508; 5 *Cowen* 516; 2 *Caines's Rep.* 38. When the parties have not contracted about the place of delivery, it must receive a reasonable construction: and it would be otherwise if a grower of trees, or a farmer who raised grain, was bound in the execution of a contract of sale to carry the trees or the grain to the vendee. But if the contract was for the payment of a debt, it would not be so unreasonable, inasmuch as it was a

[Barr v. Myers.]

substitution of specific articles for money; which is always to be tendered to the creditor.

The opinion of the Court was delivered by

SERGEANT, J.—The only question in this case is, as to the place of delivery—whether the plaintiffs were in default in not taking the trees to the defendants, at Newville, their place of residence, on or before the 21st of November 1839, or whether it was sufficient that the plaintiffs had them, on that day, at their residence in Carlisle, ready to be delivered on the demand of the defendants. The rules that regulate the delivery of portable articles, which are contracted to be sold and delivered, vary according to the nature of the contract. If by the contract neither time nor place of performance is stipulated, but they are deliverable on demand, then the general rule is, that the articles sold are to be delivered at the place where they are at the time of sale—such as the store of the merchant, the shop of the manufacturer or mechanic, and the farm or granary of the farmer, at which they are deposited or kept. And the reason is, that the party to receive is to be the actor, by going to demand the articles; and till then the other party is not in default by omitting to tender them. But the reverse is the case, where, though the place is not fixed, the time on or before which the vendor binds himself to deliver the articles is stipulated; for there the party to deliver must become the first actor, in order to fulfil his contract. He must seek out the vendee, at his residence, and there tender the articles, to save himself from default. This distinction is settled by various authorities. *Goodwin* v. *Holbrook*, (4 *Wend.* 380); *Lobdell* v. *Hopkins*, (5 *Cowen* 516); *Roberts* v. *Beatty*, (2 *Penn.* 71); *Chipman on Cont.* 29, 30; 2 *Kent's Com.* 505. I speak of portable articles capable of being conveniently carried from place to place, and obviously so intended by their nature; for there may be cases where, possibly, from the nature of the subject of the contract, it might be otherwise—and in the case of cumbersome articles, where the delivery is to be to the vendee, the vendor must seek the vendee a reasonable time before the day of delivery, to ask him to appoint a place of delivery. *Co. Litt.* 210, *b ;* *Roberts* v. *Beatty*, (2 *Penn.* 71); 2 *Kent's Com.* 507. I am not aware of any decided case which makes a distinction, when a time is stipulated for the delivery of articles, between a contract of sale and delivery, and a contract to pay a debt in certain articles; nor do I perceive the ground of such distinction.

In the present case, it would rather seem the articles ought to be considered as portable. For, though called trees, and growing in the ground at the time of the contract, yet they were to be taken up, to be replanted in the spring, and were but of small size and weight, usually put up in bundles, easily transported from place to place, and a common article of sale in that condition, even at

[Barr v. Myers.]

auction. Whether this were so or not, the law is, we think, correctly stated in the defendant's first point, and the court below erred in not so stating the law to the jury.

Judgment reversed, and *venire facias de novo* awarded.